749 So.2d 139 (1999)
Kevin LADNIER, Appellant,
v.
CITY OF BILOXI, Appellee.
No. 96-CC-01041 COA.
Court of Appeals of Mississippi.
March 9, 1999.
Rehearing Denied June 22, 1999.
Certiorari Denied September 23, 1999.
*140 Earl L. Denham, Ocean Springs, Attorney for Appellant.
Tere R. Steel, Biloxi, Attorney for Appellee.
EN BANC.
BRIDGES, C.J., for the Court:
¶ 1. Kevin Ladnier appeals from a ruling of the Circuit Court of Harrison County, Mississippi which affirmed a decision by the Civil Service Commission of the City of Biloxi that he was fired for cause. For the reasons set forth in this opinion, we affirm.

I. THE FACTS
¶ 2. Kevin Ladnier was the chief criminal investigator of the Biloxi, Mississippi, Police Department. On February 3, 1993, Ladnier sought to swear out a warrant for the arrest of Samuel Taggert on a charge of false pretenses. Late that morning, *141 Ladnier contacted Justice Court Judge Dewey Lawrence and informed Judge Lawrence of the grounds for Taggert's arrest. As was their custom in such matters, Judge Lawrence asked for a bond amount recommendation from Ladnier, who suggested that Taggert be required to post a $5,000 bond. After agreeing to the bond, Judge Lawrence signed and issued the warrant. Copies of the warrant were given to Frances Gily, the deputy justice court clerk and office manager. Ladnier retained the original warrant and placed it in his office file, but he did not check the document at that time to confirm that Judge Lawrence had written in the recommended bond amount on the warrant. In fact, Judge Lawrence set the bond at $1,000 instead.
¶ 3. Ladnier, who was ill with a high fever, went home at approximately 4:30 p.m. on that day after the warrant was issued. Later, the Long Beach Police Department officials contacted Investigator Nathan LeBlanc and informed him that Samuel Taggert was in their custody. After looking for the arrest warrant, LeBlanc called Ladnier at home. Shortly thereafter, Ladnier arrived at the station to hand over the Taggert arrest warrant. Ladnier informed LeBlanc that the bond was $5,000. However, when LeBlanc reviewed arrest warrant, he observed that the bond amount was $1,000 and brought the inconsistency to Ladnier's attention. Ladnier explained that Judge Lawrence had made an erroneous bond entry on the document and proceeded to use "whiteout" correction fluid to alter the number "1" to the number "5", thereby changing the bond amount on the arrest warrant to $5,000. When LeBlanc asked Ladnier what he was doing, Ladnier answered that he was correcting the bond amount and that he would contact Judge Lawrence the next morning about the change.
¶ 4. LeBlanc formally arrested Samuel Taggert and advised him of the bond amount. Taggert telephoned a family friend, Judge Mary Foretich, and she spoke to LeBlanc about the bond. Seeking to obtain a recognizance bond on behalf of Taggert, Judge Foretich contacted Judge Lawrence. However, Judge Lawrence refused to discuss the matter that evening and indicated that he would do so the next day.
¶ 5. The following morning, LeBlanc asked Ladnier if he had contacted Judge Lawrence. Ladnier said he had not done so and instructed LeBlanc to take the paper work over to Judge Lawrence and "take care of it." Instead, LeBlanc took the warrant to the circuit clerk's office and explained to Ms. Gily that Ladnier had altered the amount of the bond on the warrant. Ms. Gily informed LeBlanc that Taggert, after spending the night in jail, had been released earlier that morning on a recognizance bond by Judge Lawrence. LeBlanc called Ladnier and requested that he come over to the clerk's office.
¶ 6. At some point that morning, Ladnier called Ms. Gily and requested that she dispose of the Taggert warrant which she had been given because he was going to replace it with another copy reflecting the correct bond amount. Although she told Ladnier "okay," Ms. Gily did not discard the warrant because she believed that to do so would constitute a felony. When she asked Ladnier why he had raised the bond amount, he responded that Taggert was an "a______." Ladnier later admitted making this statement to Ms. Gily and, in hindsight, stated that it was not an appropriate remark as he had never met Samuel Taggert. Investigator LeBlanc confirmed that Ladnier never had any contact with Samuel Taggert, and to his knowledge, Ladnier did not know Taggert.
¶ 7. Judge Lawrence first learned of the problem with the warrant when Ms. Gily came into his office as he was meeting with the county prosecutor, Bob Payne. At the time of this incident, Judge Lawrence was recovering from open heart surgery and later stated that he discussed the bond amount with Ladnier, but he could not recall the bond amount that Ladnier recommended. *142 Having worked with Ladnier in the past, Judge Lawrence indicated that he normally would have written down the bond amount that Ladnier suggested. Although the judge stated that it was his decision to determine the bond amount on arrest warrants, he nevertheless testified that he did not believe Ladnier did anything wrong. Judge Lawrence remembered speaking to Ladnier in a telephone conversation and in person on the morning of February 4, 1993, but he could not recall whether he and Ladnier had spoken more than one time on that morning. In his later testimony, Judge Lawrence commented that had Ladnier asked him to raise the bond to $5,000, he would have approved the change.
¶ 8. Ladnier later testified that he spoke to Judge Lawrence twice on the morning after the warrant had been issued. In his first conversation, the judge informed him that Taggert would be released on a recognizance bond. Ladnier had no objections and informed the judge had he would be over at his office later that morning to talk to him about another matter.
¶ 9. This incident occurred during Ocean Springs Mayor Pete Halat's term of office. D.D. Cvitanovich was the chief of police under Mayor Halat. Cvitanovich explained that Ladnier reported the incident to him on the morning of February 4, 1993 (the day after the warrant was issued by Judge Lawrence) and that he spoke with County Prosecutor Bob Payne about Ladnier's actions. Cvitanovich stated that he was instructed by Payne to investigate the matter, report to him, and to keep the matter confidential. Although Payne denied making such a statement, Cvitanovich stated that Payne indicated to him that the district attorney disliked Ladnier and that Payne wanted to prevent the incident from "snowballing." Cvitanovich stated that he complied with Payne's request and, on February 16, 1993, forwarded a letter in which he stated:
I realize Chief Ladnier made a serious mistake by changing the amount of bond without permission and I am enclosing a copy of his explanation to for your review. His reasons for the change were ample, but he should have followed proper procedure. However, the bond did not cause [Taggert] any extra time in jail, nor did it reflect any monetary loss to him. Citing these reasons, plus the fact that Chief Ladnier's action was motivated by the need to do a proper investigation, I agree with your suggestion that this matter be handled internally, and I stand ready to discuss with you whatever recommendation you may have before I finalize what disciplinary action is to be taken.
Payne initially denied receiving Cvitanovich's letter and testified that he did not hear from Cvitanovich regarding the incident. Therefore, Payne stated that he turned over the information regarding Ladnier's actions to the district attorney for prosecution. Later in his testimony, Payne admitted to having received a letter from Cvitanovich with some of the same statements as mentioned above, but Payne said he could not be sure that the letter in evidence was identical to the one he received.
¶ 10. On March 10, 1993, after a meeting that included Cvitanovich, Mayor Halat, and Windy Sweatman, the director of public safety, Ladnier was transferred from his position as chief of investigations to a desk job as an assistant to Director Sweatman. While Ladnier lost his rank in the transfer, he did not receive a decrease in pay. According to Cvitanovich, the transfer was part of an overall reorganization in the Department of Public Safety, which included the police and fire departments of the City of Biloxi. However, no notations regarding disciplinary actions against Ladnier were included in Ladnier's personnel file. His file did show that he had been transferred.
¶ 11. On July 5, 1993, A.J. Holloway replaced Halat as mayor. Chief of Police D.D. Cvitanovich resigned from office, and the new mayor appointed Frank Duggan *143 to serve as the interim chief. Thereafter, Mayor Holloway instructed Duggan to internally investigate the matter involving Ladnier, primarily because Ladnier had been indicted on July 30, 1993, for altering a court document in the Taggert matter. After his investigation, Duggan concluded that Ladnier had violated departmental rules and regulations and placed Ladnier on administrative leave with pay until the criminal charges filed against him were concluded. Prior to this action, Ladnier had suffered a heart attack and was already on medical leave.
¶ 12. As stated, a Harrison County Grand Jury indicted Ladnier on July 30, 1993, on the charge of alteration of a court document in violation of section 97-11-1 of the Mississippi Code, as amended. At the time that the criminal action was initiated, Ladnier was recuperating from heart surgery and his attorney, Dale Robinson, recommended that Ladnier enter a diversion program which would have prevented him from having to go to trial on the charges. Under the terms of the proposed diversion program agreement, Ladnier's participation would not have been deemed an admission of guilt.[1]
¶ 13. In October 1993, Mayor Holloway appointed Tommy Moffett as the City's chief of police. Moffett reviewed Ladnier's case and discovered that Ladnier's file failed to show that any disciplinary action had been taken against Ladnier by Cvitanovich in regard to the Taggert warrant incident. Thereafter, Moffett recommended Ladnier's termination based upon inconsistencies in the reasons given by Ladnier for making the bond change. He notified Ladnier of his conclusions, and Ladnier subsequently requested a board of inquiry hearing.[2]
¶ 14. Robert McGilvary, patrol commander for the City of Biloxi, was appointed by Moffett to chair the board of inquiry. Others were appointed to the board of inquiry by Moffett, and a Corporal Hobson was selected by Ladnier to serve on the board. On May 6, 1994, the board of inquiry held a hearing on the Ladnier matter and unanimously decided that Ladnier had violated departmental rules and regulations regarding the arrest warrant.
¶ 15. After the board of inquiry's decision, Moffett recommended to Mayor Holloway that Ladnier be terminated. The mayor agreed and formally terminated Ladnier on May 24, 1994. Holloway later testified that his reasons for firing Ladnier were not politically motivated and that he did so based upon his review of (1) Ladnier's personnel file; (2) the Taggert arrest record; (3) the internal investigation report; and (4) the report of the board of inquiry. Holloway pointed out that Ladnier admitted to altering the court document and that Judge Lawrence testified before the board of inquiry that he had not given Ladnier permission to do so. Based on these facts, Holloway decided that Ladnier should be terminated.
¶ 16. On day of his termination, Ladnier requested an investigation and hearing before Biloxi's Civil Service Commission. At a regular Commission meeting on June 9, 1994, a motion was made to grant Ladnier a hearing regarding his termination. With *144 six commissioners present and one absent, the motion failed by a three-to-three vote. However, at a later Commission meeting on June 30, 1994, the Commission agreed to allow Ladnier a full hearing. Notwithstanding the Commission's ultimate decision to give him a hearing, Ladnier sought a decision from the Biloxi City Council to have several of the Civil Service Commissioners removed for cause from hearing his case. Ladnier also filed a motion for injunctive relief with the Harrison County Circuit Court and requested that the court prohibit the Civil Service Commission from hearing his case until the Biloxi City Council had the opportunity to rule on Ladnier's request to remove certain commissioners from his case. On December 12, 1994, the circuit court ruled that injunctive relief was inappropriate until Ladnier first requested that the commissioners in question recuse themselves voluntarily.
¶ 17. On December 9, 1994, Ladnier filed a motion with the Civil Service Commission requesting the recusal of Commissioners Ethel Clay, Emry McNeil, and Merry Hancock, on the grounds that (1) they attempted to deny Ladnier his constitutional right to a hearing regarding his termination from the police force and (2) that such acts created an appearance of bias and impropriety. Without notifying Ladnier of the meeting, the Commission convened to consider Ladnier's motion. Commissioner Clay recused herself from participation in the proceedings, but McNeil and Hancock refused to do so. Subsequently, McNeil presided as Chairman of the Commission during Ladnier's hearing which was held on December 20 and 21, 1994, and six of the seven members of the Civil Service Commission participated in the hearing. Ladnier, apparently, did not seek an injunction in the Harrison County Circuit Court.
¶ 18. After a full hearing on the matter, the Commission entered its order on January 5, 1995, and ratified Mayor Holloway's decision to terminate Ladnier. Among other things, they ruled: (1) that the city administration serving under former Mayor Halat had not disciplined Ladnier for the incident involving the altered warrant; (2) that the City discharged Ladnier for good cause; (3) that the City's decision to terminate Ladnier was not politically motivated; and (4) that the City's decision to terminate Ladnier's employment was justified. On February 1, 1995, Ladnier filed a motion with the Commission requesting a reconsideration of its ruling. Attached to the motion was an affidavit executed by former Mayor Pete Halat. In his affidavit, Halat stated that after a meeting between himself, Sweatman, and Cvitanovich, it was decided with his approval and direction that Ladnier would be disciplined by transferring him from his position as chief criminal investigator for the police department into a position as an assistant to the Director of Public Safety. Once again, without notifying Ladnier of the planned meeting, the Commission assembled and voted to deny Ladnier's motion for reconsideration on February 9, 1995. At this meeting which occurred on February 8, 1995, Commission also decided to strike Ladnier's motion for reconsideration from its record.
¶ 19. Ladnier filed an appeal to the Harrison County Circuit Court on February 3, 1995, pursuant to section 21-31-23 of the Mississippi Code, as amended. After filing the appeal but before the circuit court had heard arguments of counsel, Ladnier filed a motion for leave to request a new hearing before the Civil Service Commission based on new evidence. He had since been acquitted of the criminal charges for which he was under indictment,[3] and Ladnier argued to the circuit court that testimony regarding the criminal charges against him was inappropriately interjected into the proceedings before the Civil Service Commission. He contended that he was entitled to have the Commission reconsider its ruling in light of his acquittal. *145 The Harrison County Circuit Court denied Ladnier's motion, ruling that the criminal proceedings were irrelevant to the hearing before the Commission.
¶ 20. Before the circuit court considered Ladnier's appeal on its merits, he also filed a motion asking the court to compel the Commission to include in the record his post-hearing motion asking the Commission to reconsider its final ruling including the affidavit of Mayor Halat. The circuit court agreed with Ladnier on this motion and issued an order compelling the Commission to supplement the record to include Ladnier's motion for reconsideration with its attachments.[4] The grounds for Ladnier's motion for reconsideration were essentially that the City failed to refute the testimony of Cvitanovich that Ladnier was in fact disciplined during the previous administration under former Mayor Pete Halat. In support of his assertion, Ladnier attached to his motion the affidavit of Mayor Halat substantiating his claim that he had been previously disciplined for his conduct involving the Taggert warrant.
¶ 21. In its decision in the case sub judice, the circuit court affirmed Ladnier's termination and ruled that sufficient evidence existed upon which the Commission could base its decision. The court also ruled that Ladnier's claim of double jeopardy/double punishment was a "legitimate issue of fact for the commission to consider in its hearing and such fact issue was so decided and this court cannot find that such finding had no substantial evidence to support the finding." From the circuit court's judgment, Ladnier filed his appeal to this Court.
¶ 22. The City of Biloxi filed a cross-appeal and contested the decision of the circuit court requiring the Commission to include in the record on appeal Ladnier's motion for reconsideration with its attachment of the Halat affidavit.

II. THE ISSUES
¶ 23. On appeal, Ladnier raises the following issues which are taken verbatim from his brief:
1. THE CIRCUIT COURT ERRED IN AFFIRMING THE TERMINATION OF APPELLANT'S EMPLOYMENT AS SAID DECISION BY BOTH THE CITY AND THE BILOXI CIVIL SERVICE COMMISSION WAS: (a) ARBITRARY AND CAPRICIOUS; (b) NOT SUPPORTED BY SUBSTANTIAL EVIDENCE; (c) POLITICALLY MOTIVATED; AND (d) NOT MADE IN GOOD FAITH FOR CAUSE.
2. WAS THE DOUBLE PUNISHMENT OF APPELLANT A VIOLATION OF DUE PROCESS AND THUS BARRED BY THE 5TH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE III, SECTION 22 OF THE MISSISSIPPI CONSTITUTION?

CROSS-APPEAL
On cross-appeal, the City of Biloxi raises the following issue:
1. WHETHER THE CIRCUIT COURT ERRED IN ADMITTING THE AFFIDAVIT OF PETE HALAT INTO THE RECORD ON APPEAL?

III. ANALYSIS

STANDARD OF APPELLATE REVIEW
¶ 24. Sections 21-31-1 through 21-31-75 of the Mississippi Code provide the legislature's statutory procedure governing employees of Mississippi municipalities.[5] *146 Section 21-31-23 specifically sets forth the procedures for removal, suspension, demotion and discharge of a municipality employee. The statute provides that the decision of the municipality's civil service commission is conclusive and binding unless there is a subsequent appeal to the circuit court. See Miss.Code Ann. § 21-31-23 (Rev.1990). Moreover, the statute specifically provides that the circuit court is restricted to a "determination of whether the judgment or order of removal, [or] discharge, ... made by the commission, was or was not made in good faith for cause, and no appeal to such court shall be taken except upon such ground or grounds." Id. On this subject, the Mississippi Supreme Court commented:
[W]e must ever bear in mind that it is not what the court, had it been a member of the governing authority, might have done in a particular instance, or indeed whether or not the court thinks a mistake may have been made, but instead the criterion is whether or not from an examination of the record there exists credible evidence substantiating the action taken by the city. It is upon this basis that the court determines whether or not the decision was in "good faith for cause." Courts are not empowered to supervise the intelligence, wisdom or fairness of the governing authorities, and no resources are available to a court to exercise such a function even if granted, in this extremely difficult task of determining the fitness of a particular person for a particular job. The task must be left to the governing authorities of the city. It is only when the record makes it clear that there is no "substantial evidence" supporting the governing authorities' determination that a court can act, and in such case it must.
City of Jackson v. Froshour, 530 So.2d 1348, 1355 (Miss.1988) (emphasis added). This Court's review is likewise limited. However, the supreme court has recognized that "[i]ntertwined with this question is whether or not there was substantial evidence before the Civil Service Commission to support is order and whether it is arbitrary, unreasonable, confiscatory, and capricious." Id. (citations omitted). Accordingly, we examine this case to ascertain whether there was substantial evidence to support the Commission's decision that Ladnier was discharged with good cause and whether or not the Commission's decision was arbitrary, unreasonable, confiscatory and capricious.
¶ 25. Ladnier maintains that his hearing before the Civil Service Commission was a quasi-criminal proceeding in nature. In support of this position, he relies on In Re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) and Levi v. Mississippi State Bar, 436 So.2d 781 (Miss.1983). In Levi, the Mississippi Supreme Court, quoting the United States Supreme Court in In re Ruffalo, ruled that "bar disciplinary proceedings are inescapably `adversary proceedings of a quasi-criminal nature.'" Levi, 436 So.2d at 782. In those cases, because the proceedings were quasi-criminal in nature, the higher clear and convincing standard of proof was applied. Without stating the basis for his opinion that the proceedings in this case were quasi-criminal, the appellant analogizes that since the civil service hearing in his case was quasi-criminal, a higher standard of proof ought to be employed here, and the circuit court should have been required to find that clear and convincing evidence was in existence to support the Commission ruling before affirming it. We disagree. In re Ruffalo and Levi are not persuasive authority for the theory that a hearing before a civil service commission is a quasi-criminal proceeding, and we have found no other authority supporting such a position. We rule that Ladnier's civil service proceeding *147 was an administrative hearing which we will review pursuant to the substantial evidence standards previously set forth in City of Jackson v. Froshour, 530 So.2d at 1355.

DISCUSSION OF THE ISSUES
¶ 26. Ladnier divides his argument on appeal into several sections, and asserts (1) that the City's decision to terminate Ladnier was arbitrary and capricious; (2) that the Commission's ruling was without substantial evidence; (3) that the Commission was permeated with such bias and political motivation that Ladnier was deprived of a fair hearing; (4) and that the Commission's decision was not made in good faith and for good cause. In addition, Ladnier claims (5) that his termination was improperly induced by political motivations and that his appeal to the Civil Service Commission was influenced by inappropriate political bias and prejudices of the Commission members. At several points during the Commission hearing, the appellant attempted to present evidence and testimony which were denied by the Commission. Consequently, through the use of proffers on the record but outside the presence of the Commission, Ladnier argued what the evidence would have established had he been permitted to admit it before the Commission. Accordingly, Ladnier also complains (6) that he was denied a fair hearing on the grounds that he was not allowed to offer relevant evidence for the Commission to consider.
¶ 27. In considering this appeal, we will address the issues on appeal as follows:
1. WAS THERE SUBSTANTIAL EVIDENCE TO SUPPORT THE COMMISSION'S FINDINGS?
2. WAS THE DECISION OF THE COMMISSION ARBITRARY AND CAPRICIOUS OR IMPROPERLY INFLUENCED BY POLITICAL BIASES AND PREJUDICE DENYING LADNIER A FAIR HEARING?
3. WAS LADNIER DENIED DUE PROCESS AND PUNISHED TWICE FOR THE SAME OFFENSE, THEREBY VIOLATING THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION?
We will also consider the City's cross-appeal and whether the circuit court erred in considering Pete Halat's affidavit.

1. WAS THERE SUBSTANTIAL EVIDENCE TO SUPPORT THE COMMISSION'S FINDINGS?
¶ 28. Ladnier contends that the Commission's finding that his termination was for good cause is not supported by substantial evidence. In doing so, Ladnier argues that the Commission inappropriately disregarded the testimony of former Police Chief D.D. Cvitanovich that Ladnier's transfer constituted disciplinary action against the appellant. On the issue of whether there was substantial evidence to support the Commission's decisions, the circuit court ruled:
This court has thoroughly reviewed the record in this matter as well as having considered the proffers made during the course of the civil service hearings and confining itself to the narrow scope of permissible review and determination, cannot say that the action of the city which was affirmed by the civil service commission was a product of political motivations or religious reasons and was not a decision which was made in good faith.... The decision of this court remains, not what the court would have imposed as a sanction but whether the action of the city and its civil service commission was arbitrary and/or capricious or was supported by substantial evidence and was made in good faith for cause. This court so finds and the decision of the civil service commission in upholding the action of the mayor shall be affirmed.
¶ 29. "Substantial evidence" in the context of reviewing a decision of an administrative agency has been defined as such evidence "as a reasonable mind might accept *148 as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." State Oil & Gas Bd. v. Mississippi Mineral & Royalty Owners Assoc., 258 So.2d 767, 779 (Miss.1971) (citation omitted).
¶ 30. At the civil service hearing, Nathan LeBlanc testified first. Ladnier was his immediate supervisor, and he followed the orders given to him by Ladnier. He testified as to the events surrounding Ladnier's alteration of the warrant. LeBlanc denied any involvement in the alteration of the document and stated that Ladnier should have gotten Judge Lawrence's approval before changing the document. Further, LeBlanc stated that D.D. Cvitanovich informed him that the matter involving Ladnier would be handled internally between himself and Bob Payne, the county prosecutor.
¶ 31. Frances Gily, the deputy clerk, testified before the Commission that Ladnier asked her to discard her copy of the Taggert warrant because the bond amount had been raised. She refused because, in her opinion, she would have violated the law in doing so. Ladnier told her that he raised the amount of the bond because Taggert was an "a______." Ms. Gily was the first to inform Judge Lawrence that Ladnier had raised the bond amount on the Taggert warrant.
¶ 32. Tommy Moffett, the new and permanent Chief of Police in Mayor A.J. Holloway's administration, testified that he recommended to Mayor Holloway that Ladnier be discharged because he wrongfully changed the bond amount on a court document. Moffett stated that he based his decision to discharge Ladnier on the inconsistencies in his explanations for changing the amount of the bond. In making his decision, Moffett also testified that he reviewed Ladnier's personnel file, the findings of the board of inquiry, Ladnier's written statement, and the results of the internal investigation. In Moffett's opinion, Ladnier was being untruthful concerning his reasons for changing the bond. According to Moffett, there were indications from Ladnier that he changed the bond because Taggert was a "jerk," and because he was waiting on a criminal history check, rather than because it was a typographical error as he claimed. Moffett further testified that a bond should not have been punishment to an accused and that Taggert's prior criminal history should not have influenced the bond amount. He stated that the purpose of a bond is to secure an accused's appearance in future criminal proceedings. Essentially, Moffett believed that Ladnier's actions, which he considered to be a violation of the law, warranted his dismissal. As stated, Moffett did not believe the explanations Ladnier gave for altering the court document and felt that there were other undisclosed and improper reasons which caused Ladnier to change the bond.
¶ 33. Next to testify before the Commission was Mayor A.J. Holloway. He testified that after he began his term as Mayor of Biloxi, he directed Frank Duggan, whom he had appointed as Interim Chief of Police, to investigate the Ladnier matter. Holloway's testimony clearly indicated that Ladnier's indictment was the pivotal event that spurred his decision to investigate Ladnier. Holloway stated that after discussing the matter with Duggan, he found that there was nothing in the police records to show that an internal investigation had taken place. Holloway and Duggan decided that pending the outcome of the criminal proceedings, Ladnier should be placed on administrative leave with full pay. Holloway made his final decision to terminate the appellant based on the arrest records, the internal investigation report, and the board of inquiry report. Holloway concluded that after a board of inquiry decided that Ladnier had violated police rules and regulations, there were sufficient grounds to dismiss Ladnier. Holloway affirmatively stated that *149 politics played no role in his decision to discharge the appellant.
¶ 34. Rodney McGilvary was also called by the City to testify. McGilvary, who chaired the board of inquiry, explained to the Commission that he and the other members of the board of inquiry heard testimony from various witnesses involved with the Taggert warrant. Ladnier was given the first opportunity to articulate his version of the events surrounding the incident to the board. Unanimously, the board of inquiry agreed that Ladnier violated departmental rules and regulations.
¶ 35. The appellant offered the testimony of former Chief of Police, D.D. Cvitanovich. He explained the events surrounding the Taggert warrant and stated that Ladnier immediately informed him of what had happened and admitted to changing the bond amount. Cvitanovich indicated that when he was told of the incident, he did not regard it as very serious because Taggert had been released on a recognizance bond and the alteration of the bond did not harm Taggert. In other words, Ladnier's actions did not keep Taggert in jail. After discussing the matter with the county prosecutor, Bob Payne, Cvitanovich conducted his own investigation as instructed by Payne. Cvitanovich also kept the matter confidential as Payne directed him to do.
¶ 36. According to Cvitanovich, Payne informed him that he did not think the matter was serious and that it should be handled internally by the police department. Following his investigation, Cvitanovich submitted a written report to Payne. As stated, Cvitanovich informed Payne in a letter dated February 16, 1993, that he agreed with Payne that the matter involving Ladnier and his actions ought to be handled internally. Cvitanovich noted in the letter that Ladnier's motivations included the need to do a proper investigation. Cvitanovich agreed that Ladnier made a serious mistake but offered the opinion that Ladnier's reasons for making the change "were ample."
¶ 37. Cvitanovich later learned that Bob Payne had met with Mayor Halat regarding the matter. Thereafter, Cvitanovich, and the Director of Public Safety, Windy Sweatman, met with Mayor Halat regarding Ladnier and his actions. Cvitanovich testified that in the meeting they discussed what disciplinary action should be taken since it was clear that the county prosecutor expected that some type of punishment of Ladnier was appropriate. Because Mayor Halat and Sweatman had already decided that a reorganization of the police department was required, they concluded that Ladnier should relinquish his position as head of criminal investigations and be transferred into a position as an administrative assistant to the director of public safety.[6] Cvitanovich testified that Ladnier was purposefully removed as chief of investigations and placed in a desk job as his punishment for violating police policy. Tommy Moffett was selected to replace Ladnier as head of criminal investigations. Not having heard any more from Bob Payne, Cvitanovich concluded that such time had elapsed that they were required to discipline Ladnier. Moreover, Cvitanovich noted that it was not uncommon for a city government agency to transfer someone as a means of discipline, rather than go through the formal channels of a disciplinary action. He testified that he had done so in the past, and, in his opinion, Ladnier, Sweatman and Mayor Halat fully understood that Ladnier's transfer constituted his punishment for altering the bond without permission to do so.
¶ 38. According to Cvitanovich, Moffett was not informed of the reasons for Ladnier's transfer, because Cvitanovich believed that he was sworn to secrecy pursuant to Bob Payne's instructions. He also testified *150 those attending the meeting with Mayor Halat understood that Ladnier's removal from a supervisory to an administrative position was taken so that such an incident would not occur again.
¶ 39. On cross-examination, the City requested that Cvitanovich read into the record a memorandum circulated by Windy Sweatman to the members of the police department regarding the department reorganization. Essentially, the document states that the purpose of the reorganization was for the improvement of the efficiency and effectiveness of the police department and department of public safety. Cvitanovich stated that to his knowledge Ladnier's pay did not decrease as a result of the transfer.
¶ 40. In response to questions posed to him at the Commission hearing by members of the Civil Service Commission, Cvitanovich revealed that the county prosecutor instructed him to keep the matter quiet because there were hard feelings between the district attorney and Ladnier. He testified that in an unrelated case, Cvitanovich and Ladnier sought to have a case prosecuted, but the district attorney, Cono Carranna, disagreed. As a result, the three men became involved in a heated discussion. According to Cvitanovich, county prosecutor Payne asked him not to say anything to anyone about the bond alteration because Payne believed that Corrana might use the situation to get back at Ladnier.
¶ 41. Ladnier also called Judge Lawrence to testify. In sum, Judge Lawrence conceded that he had not given Ladnier permission to raise the bond but that he would generally fix bond amounts recommended by Ladnier in such cases as this. In addition, he stated that had Ladnier asked for the increase in bond, he would have approved it. The judge also commented that he did not believe that Ladnier did anything wrong because he was aware that situations such as this had occurred in the past, although not in his court. The judge further testified that he could not recall whether Ladnier asked him for a $5,000 or a $1,000 bond at the time the Taggert arrest warrant was issued.
¶ 42. Dale Robinson, the attorney who represented Ladnier in regard to the criminal charges brought against him, was also asked to testify. After issues of attorney/client privileges were resolved, Robinson testified as to his representation of Ladnier. Robinson explained that he recommended that the appellant enter into a diversion program which was designed by the legislature to allow accused persons the opportunity to resolve the charges against them and to avoid criminal convictions.[7] Robinson further testified that he learned through a private investigator assisting him on the case that Ladnier had received administrative punishment for his actions during the Halat administration. He learned that as his penalty Ladnier relinquished his position as chief investigator and was reassigned to a position with minimal responsibilities.
¶ 43. Judge Mary Foretich testified to the Commission that she sought to obtain a recognizance bond for Taggert. After calling Judge Lawrence on the evening in question, she confirmed that he explained to her that it was a matter that he would handle the next morning. Judge Foretich also agreed that the amount of bond did not affect Taggert since he was released on his own recognizance.
¶ 44. Kevin Ladnier was next in line to testify before the Commission. He explained to the Commission the sequence of events regarding his altering of the document and confirmed that he at no point attempted to hide the fact that he changed a court document. Ladnier's explanation was that he knew that he could not call *151 Judge Lawrence at home because the judge was recuperating from heart surgery and was, at that time, refusing to handle court business at home. The appellant acknowledged that he told Frances Gily that he raised the bond because Taggert was an "a______." However, he explained that he did not know Taggert and that, in hindsight, he was not smart in making such a statement. Ladnier stated that in his seventeen years as a police officer he had only been reprimanded on one occasion, which involved a dispute which he had with another officer.
¶ 45. The City of Biloxi called Tommy Moffett as a rebuttal witness. Moffett testified that he was assigned as chief of investigations and over the crime unit after Ladnier's transfer to the department of public safety. He stated that after asking Sweatman why he was moving Ladnier to his office, Sweatman indicated that there was no specific reason other than the reorganization. Moffett also testified that he asked Ladnier face-to-face about the reasons for his transfer. Ladnier told him that it was because of the reorganization. Moffett also testified about the procedures used to discipline police officers. He stated that the disciplinary procedures in effect at the time of the hearing were the same as those in effect when Ladnier was transferred. He also stated that in his twenty-one years of service he had not known of a case where someone had been transferred as a means of punishment.
¶ 46. Bob Payne, the county prosecutor, concluded the testimony offered at the civil service hearing. Payne recalled that, after learning that Ladnier had altered a court document, Ladnier came to his office and admitted his mistake. Payne called Cvitanovich and requested that he investigate the matter to determine whether it should be handled administratively or criminally. According to Payne, he indicated to Cvitanovich that he did not have enough information to decide whether a "criminal offense" had occurred or whether a "firing offense" had occurred. Payne asked Cvitanovich to get back with him on the situation, but Payne testified that he never heard from Cvitanovich. Therefore, he turned the matter over to the district attorney's office. Payne has no recollection regarding the exact date that he handed over the case to the district attorney's office. He stated that district attorney's investigator completed an investigation, and Payne learned that the investigator's recommendation was that Ladnier's actions be handled internally.
¶ 47. Payne initially denied ever receiving Cvitanovich's letter but later recanted his testimony and stated that he did receive "a" letter from Cvitanovich. However, he could not be sure that the one in evidence was the same letter he received. On cross-examination, Payne admitted that the letter in question could have been the one he received from Cvitanovich. He further testified that he remembered reading a letter in which Cvitanovich commented that he agreed with Payne that Ladnier and his actions ought to be handled internally, although Payne stated he did not agree. Payne admitted that he never contacted Cvitanovich after receiving a letter to inform Cvitanovich that he did not think the matter should be handled internally.
¶ 48. Payne testified that he and Cvitanovich never discussed what disciplinary action would be taken against Ladnier. He did admit talking to Ladnier about his actions and informed him that if he would get out of law enforcement, he could likely plead guilty to contempt of court for his actions. At that time, Payne stated that he was looking at the situation as an obstruction of justice charge.
¶ 49. Payne testified that Ladnier asked him to meet with Mayor Halat. He acknowledged that he met with Halat, and they looked at the Mississippi criminal statute applicable to altering a court document. They concluded that Ladnier was looking at a possible felony charge. Payne testified that after turning over the case to the district attorney's office, he was not *152 informed of the how the facts in the case developed.
¶ 50. On cross-examination, Payne stated that after never hearing back from Ladnier regarding the negotiation which he thought he was having with the appellant, he turned the matter over to the district attorney. In response to questions by the Commission, Payne testified that he instructed Cvitanovich to conduct his investigation discreetly. He also instructed Judge Lawrence and Frances Gily not to talk about the incident to anyone and that an investigator would contact them directly about Ladnier and his actions.

RESOLUTION OF THE ISSUES
¶ 51. As stated, our question here is whether there was substantial evidence to support the Commission's rulings. The Commission first ruled that the appellant "had not been disciplined in any manner whatsoever by the previous administration for the conduct which formed the basis of this appeal."
¶ 52. Mayor Holloway and Chief of Police Tommy Moffett testified that after Duggan investigated the matter, nothing was found in Ladnier's record indicating that he had been disciplined for his actions. After finding nothing in the record informing him that Ladnier had been disciplined for any misconduct, Duggan recommended to Holloway that Ladnier be placed on administrative leave until the criminal charges against Ladnier were resolved. Thereafter, Moffett was appointed chief of police. Moffett reviewed the investigation by Duggan, Ladnier's explanation for his actions, and the other records on the mater and decided that Ladnier's punishment should be his dismissal. Moffett also testified that he asked Ladnier face-to-face whether there was something more to Ladnier's transfer than the reorganization. Moffett stated that Ladnier indicated that his move was only because of the reorganization. Furthermore, Moffett indicated that to his knowledge transferring an officer from one department to another was not a form of discipline.
¶ 53. Conversely, Ladnier argues that Cvitanovich's testimony that discipline did take place was uncontradicted. Ladnier also contends that the Commission's complete disregard for Cvitanovich's testimony on this issue denied him a fair hearing. While it is true that no one other than Cvitanovich and Ladnier testified about the understanding that Ladnier's punishment was to be his transfer to the department of public safety, we rule that the Commission was within its discretion as fact finder to determine whether such testimony was unreliable. Ladnier's testimony that he received punishment for his actions by virtue of his transfer arguably could be considered to be self-serving and thereby suspect. Moreover, Moffett testified that he spoke to Director Sweatman and Ladnier and both indicated that there existed no other reason for Ladnier's transfer other than for the reorganization. Moffett stated that he did not know of any case where a transfer was used as a means of punishment.[8] It is also noteworthy that Ladnier's claim that disciplinary action took place was not supported by the official documents offered into evidence regarding his transfer. The documents state that the reorganization took place in order to promote the efficiency of the police and public safety departments.
¶ 54. The City maintains that no evidence was presented that any of the police department's written disciplinary procedures were invoked as to Ladnier, further supporting its conclusion that Ladnier had not been disciplined. The City also contends that Cvitanovich's testimony was not credible because he had followed normal police disciplinary procedures when reprimanding Ladnier for an unrelated previous *153 incident.[9] Finally, the City contends that the only types of disciplinary action allowable to Ladnier in accord with its Civil Service Regulations were demotion, suspension or termination. We note, however, that the Civil Service Regulations also define "discipline" to include written reprimands and written warnings as a means of disciplining an employee.
¶ 55. We agree with the appellant that a civil service employee cannot lawfully be disciplined twice for the same conduct. Although we have found no Mississippi law, rule, or regulation specifically addressing this point, other jurisdictions have held that a state agency may not punish an employee twice for the same actions. See James v. Sewerage and Water Bd. of New Orleans, 505 So.2d 119, 122 (La.Ct.App., 1987) (holding that a public employee cannot be disciplined twice for "a single dereliction"); State Dep't. of Transp. v. State Career Serv. Comm'n, 366 So.2d 473 (Fla.Dist.Ct.App.1979) (ruling that disciplinary action administered to a public employee may not be increased at a later date nor may an agency discipline an employee twice for the same offense); Rochon v. Rodriguez, Superintendent of Police, City of Chicago, 293 Ill.App.3d 952, 228 Ill.Dec. 416, 689 N.E.2d 288, 292 (1997) (holding that "a probationary employee cannot be dismissed for a reason that has been the basis of a previous disciplinary sanction."). Mississippi law states that a civil service employee may only be terminated for good cause. See Miss.Code Ann. § 21-31-71 (Rev.1990). If a civil servant was disciplined once for certain misconduct, it follows that good cause would not then exist to sustain the employee's later discharge.
¶ 56. Here, the Commission specifically found that Ladnier had not been disciplined by the previous administration. The duty is upon the Commission "as trier of the facts, to determine what the real facts were in connection with the discharge. They saw and heard the witnesses, and observed their demeanor." Hill v. City of Hattiesburg, 223 Miss. 163, 166, 77 So.2d 827, 828 (1955). Additionally, "[s]ince the commission upheld the discharge, the evidence supporting that action must be taken most favorably to that order." City of Jackson Police Dept. v. Ruddick, 243 So.2d 566, 567 (Miss.1971). Based on the evidence and testimony given before the Commission, we cannot conclude that there was no substantial evidence to support the Commission's findings.
¶ 57. Next, the Commission found that Ladnier had in fact been discharged for good cause. Once having made a determination that Ladnier had not been disciplined by the Halat administration, it also follows that good cause existed for Ladnier's termination, that is, his admitted unauthorized alteration of a court document. Accordingly, the Commission had substantial evidence before it to arrive at such a conclusion.
¶ 58. As stated, the Civil Service Commission decided that the City's decision to terminate Ladnier was not politically motivated. The focus of Ladnier's arguments on appeal regarding inappropriate political motivations is on the Commission and not the City's alleged political motivations for Ladnier's termination. Having reviewed the record on appeal, we find that there was sufficient evidence to support the Commission finding that Ladnier's discharge was not based on the City's political motivations.

2. WAS THE DECISION OF THE COMMISSION ARBITRARY AND CAPRICIOUS OR IMPROPERLY INFLUENCED BY POLITICAL BIASES AND PREJUDICE DENYING LADNIER A FAIR HEARING?
*154 ¶ 59. On appeal, we are charged with determining whether or not the Commission acted in good faith. "The burden to show that the commission ... acted in bad faith or without cause ... [is] upon the appellant employee." Stegall v. City of Meridian, 230 Miss. 176, 180, 92 So.2d 331, 332 (1957) (citation omitted). Additionally, where an appellate court finds that there is substantial evidence supporting an agency's decision, such a decision was not made arbitrarily or capriciously. Chandler v. City of Jackson Civil Service Comm'n, 687 So.2d 142, 143 (Miss.1997).
¶ 60. Ladnier argues that the Civil Service Commission was so biased against him that he was deprived of a fair hearing. In support of his position, Ladnier cites the Commission's complete disregard for the testimony of Cvitanovich and the Commission's refusal to admit into evidence Biloxi Police Department policies regarding the use of "white-out" correction fluid, and a similar incident involving "John Doe."[10]
¶ 61. The Civil Service Commission, as a duly authorized administrative body, was charged with the duty of being a fact finder in this case. See C.H. Hill v. City of Hattiesburg, 223 Miss. 163, 166, 77 So.2d 827, 828 (1955). The Commission was given the opportunity to hear the witnesses testify and to determine for itself what testimony was credible or not. There is nothing in the record to show that the Commission "completely disregarded" Cvitanovich's testimony. Rather, the record shows that such testimony was considered. After the attorneys completed their examination of Cvitanovich, several commissioners questioned Cvitanovich about specific facts. While the record is clear that they disagreed with Cvitanovich, it cannot be said that his testimony was completely disregarded.
¶ 62. Ladnier argues that the Commission's refusal to permit him to elicit certain testimony and admit certain evidence displayed the Commission's biases against him. As stated, Ladnier was prohibited by the Commission from presenting evidence involving an individual referred to by the Commission as "John Doe." According to Ladnier's proffer of evidence, "John Doe" was a city employee working for Mayor Holloway. Doe was stopped by an officer who requested that he submit to a breath test to determine if he was illegally driving under the influence of alcohol. Ladnier sought to establish that Doe was subsequently taken to the police station where he refused the breath test and was charged with a "DUI refusal." Later, Doe's charge of "DUI refusal" on police records was altered to show that he was charged with illegally failing to wear a seat belt. Ladnier wanted to introduce evidence of such to show that actions similar to those involving Ladnier occurred within the Biloxi Police Department. The Commission refused to hear any the testimony or any evidence regarding John Doe on the grounds that such evidence was irrelevant to Ladnier's case. The City notes on appeal that despite the Commission's ruling that the "John Doe evidence" was irrelevant, the Commission subsequently allowed a number of documents pertaining to the John Doe incident.
¶ 63. Having read the record and considered arguments on appeal, we find that Ladnier's right to a fair hearing was not denied by the Commission's refusal to admit certain evidence regarding the John Doe incident or the Commission's refusal to admit evidence of current police department policies regarding the use of correction fluid. As noted several times during the hearing, rules regarding the admission *155 of testimony and evidence before such an administrative body are relaxed and such a body has the authority to admit or refuse evidence as it reasonably sees fit. Riddle v. Mississippi State Bd. of Pharmacy, 592 So.2d 37, 43 (Miss.1991) (formalities of practice, procedure and evidence as in courtroom proceedings are relaxed in all administrative proceedings). We find no reversible error in the Commission's ruling in this regard.
¶ 64. Ladnier also vehemently argues that the Commission's initial decision to deny him a hearing establishes the Commission's predisposition in his case. As stated, Ladnier sought the removal of Commissioners McNeil and Hancock from hearing his case. As the City points out, it is noteworthy that Commissioner Hancock did not vote to deny Ladnier a hearing. We also rule that McNeil's refusal to recuse himself from Ladnier's case does not in and of itself indicate his inability to fairly adjudicate the proceedings before him. Ladnier urges that McNeil's rulings and conduct as a whole during the proceedings are evidence of his bias. We disagree. We note that much of the conflict during the hearing was unnecessarily provoked by counsel for Ladnier by use of constant objections and by continually challenging the Commission concerning its alleged biases and prejudice toward his client. We rule that Ladnier has failed to carry his burden and failed to show that the Biloxi Civil Service Commission affirmed his discharge because of improper political motivations. See Stegall, 230 Miss. at 180, 92 So.2d. at 332 ("the burden to show that the commission ... acted in bad faith or without cause was upon the appellant employee").
¶ 65. Having decided that there was substantial evidence supporting the decisions of the Biloxi Civil Service Commission, we also find that the decision of the Commission was not made arbitrarily or capriciously. To the contrary, the Commission conducted a hearing that lasted two full days at which numerous witnesses testified and several documents were presented for their consideration. Many of the witnesses were asked questions directly by members of the Commission, which is an indication to this Court that the Commissioners were not passive but were actively involved in the proceedings.

3. WAS LADNIER DENIED DUE PROCESS AND PUNISHED TWICE FOR THE SAME OFFENSE, THEREBY VIOLATING THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION?
¶ 66. Ladnier argues that the City of Biloxi violated the United States Constitution's Fifth Amendment Double Jeopardy Clause when Mayor Holloway dismissed him after he had previously been punished under the command of former Chief of Police D.D. Cvitanovich. On this issue, Ladnier contends that, in accord with the principles of equitable estoppel, the City should be prohibited from seeking to discipline Ladnier again for the same misconduct. Finally, the appellant asserts that even if we determine that principles of double jeopardy and equitable estoppel are inappropriate, the doctrine of res judicata should be applied. At the circuit court level, Ladnier advocated that his dismissal violated the Double Jeopardy Clause and that the doctrine res judicata applied to the facts in this case. The circuit court ruled that issues regarding double punishment were properly considered by the Commission and that it could not conclude that there was no substantial evidence to support the Commission's finding that Ladnier was not punished twice for the same offense.
¶ 67. The City urges that constitutional double jeopardy issues only pertain to criminal punishment and not to disciplinary actions involving employment citing, among other cases, Breed v. Jones, 421 U.S. 519, 528, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). In Breed, the United States Supreme Court stated that the Double Jeopardy Clause is inapplicable where the *156 proceedings are not "essentially criminal." Id. at 528, 95 S.Ct. 1779 (citation omitted). The Court observed "the risk to which the term jeopardy refers is that traditionally associated with `actions intended to authorize criminal punishment to vindicate public justice.'" Id. at 529, 95 S.Ct. 1779 (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 548-49, 63 S.Ct. 379, 87 L.Ed. 443 (1943)). As stated, we disagree with the contention that his civil service hearing was "quasi-criminal" in character. We rule that Ladnier's transfer that he contends was his first "punishment" is clearly not the type of criminal punishment contemplated by the Double Jeopardy Clause. Further, because we have affirmed the Biloxi Civil Service Commission ruling that Ladnier was not disciplined by the City of Biloxi's previous administration, the issue of whether the Double Jeopardy Clause was violated becomes moot.
¶ 68. As stated, Ladnier asserts that the doctrine of equitable estoppel prohibits his termination from his employment with the City. In response, the City maintains that this assertion was not made on appeal to the circuit court and is not, therefore, properly postured for our review. We agree, and we will not put a lower court in error, for that which was not presented to it for a decision. Duplantis v. State, 708 So.2d 1327, 1339 (¶ 49) (Miss.1998).
¶ 69. As to Ladnier's res judicata argument, the City points out that the alleged disciplinary transfer of Ladnier which allegedly constituted his first punishment was never litigated and brought to a final judgment. Therefore, the doctrine of res judicata is inapplicable as the doctrine "operates to bar a legal action when the parties have already litigated the cause of action to a final judgment in a previous action....For res judicata to lie, a previous action must have conclusively decided the claim which is asserted in the second action." Stewart v. Guaranty Bank and Trust., 596 So.2d 870, 872 (Miss.1992). Because there was no previous legal action brought in this case against Ladnier, we rule that the doctrine of res judicata is not applicable.

CROSS-APPEAL

1. WHETHER THE CIRCUIT COURT ERRED IN REQUIRING THE BILOXI CIVIL SERVICE COMMISSION TO INCLUDE THE AFFIDAVIT OF PETE HALAT IN ITS RECORD ON APPEAL?
¶ 70. Because we have affirmed the Biloxi Civil Service Commission's decision in this case, this issue is moot, and we will not address it.
¶ 71. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY AFFIRMING THE TERMINATION OF KEVIN LADNIER IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., COLEMAN, AND PAYNE, JJ., CONCUR. DIAZ DISSENTS WITH SEPARATE WRITTEN OPINION.
IRVING, LEE, AND THOMAS, JJ., NOT PARTICIPATING.
DIAZ, J., Dissenting:
¶ 72. Respectfully, I dissent to the majority in this case as I would conclude that there was insufficient evidence to sustain the Biloxi Civil Service Commission's finding that Ladnier had not been punished by the previous city administration. For the reasons set forth in this opinion, I would reverse and render.
¶ 73. The first significant finding of the Biloxi Civil Service Commission was:
6. That the Appellant, Kevin Ladnier, had not been disciplined in any manner whatsoever by the previous city administration for the conduct which formed the basis of this appeal.
This finding by the Civil Service Commission was necessary to affirm the City's *157 decision to terminate Ladnier. While there is no Mississippi rule or regulation on the issue as the majority indicated, it is clear that "good cause" would not have existed to terminate Ladnier if in fact the Commission found that he had been previously disciplined for his misconduct. Thus, the Commission could justify Ladnier's termination only if it also determined that the previous City of Biloxi administration had not elected to discipline Ladnier for violating police department policies.
¶ 74. The standard by which we are called to review a decision of an administrative agency was expressed in City of Meridian v. Johnson, 593 So.2d 35, 38 (Miss.1992) wherein the court stated:
The scope of appellate review is limited to an examination of the record to determine whether there exists credible evidence substantiating the Commission's action-whether the decision of the Civil Service Commission was made "`in good faith for cause.'"
(citation omitted). We are not permitted to substitute our opinion for that of an agency or re-weigh facts of case. Mississippi State Bd. of Public Accountancy Acting as Bd. and Trial Bd. v. Gray, 674 So.2d 1251, 1253 (Miss.1996). Additionally, deference is given to an administrative agency as trier of the facts as well as the judge of witnesses' credibility. Nelson v. Mississippi State Bd. of Veterinary Medicine, 662 So.2d 1058, 1062-63 (Miss.1995).
¶ 75. I disagree with the majority that substantial evidence existed to support the commission's finding in this regard for a number of reasons. There was testimony from three individuals that Ladnier had been punished as he claims. First, and obviously, Ladnier testified as much. Cvitanovich, Ladnier's superior under the City's former administration, clearly stated that Ladnier's transfer was in fact his punishment. Cvitanovich explained that purpose of Ladnier's punishment was to effectively take him out of the police department so that he could not be in a position where a similar act could occur again. Ladnier's transfer did just that. He was moved from a position of a high ranking investigator to a "desk job," assisting the director of public safety with his duties overseeing both the fire and police departments. Thus, Ladnier was no longer performing the duties of a police officer, a position which he held for over seventeen years. There was also the testimony of Dale Robinson, Landier's attorney representing him in the criminal proceedings, who indicated that he learned from a private investigator he hired to assist him that Ladnier had been disciplined by the city administration under Pete Halat's direction.[11] Robinson testified that he was informed that the Appellant was relieved of his responsibilities as chief of police investigations and reassigned to a position where he was given minimal responsibilities.
¶ 76. In opposition to Ladnier's claims, the City offered the testimony of Tommy Moffett, the newly appointed chief of police, and Mayor Holloway. Moffett and Mayor Holloway testified that Ladnier's personnel file failed to reflect that he was disciplined. Neither of these individuals, however, were privy to the discussions between the former chief of police, Cvitanovich, the director of public safety, Windy Swetman, and Ladnier. Cvitanovich testified that the matter involving Ladnier was kept confidential as he was instructed by the city attorney to keep the matter private. Effectively, the City failed to refute Cvitanovich's positive testimony that Ladnier's transfer constituted his punishment for his wrongful conduct. The City did not offer any testimony, particularly from someone with knowledge of the events surrounding *158 Ladnier's transfer, to contradict Cvitanovich's testimony.
¶ 77. Where evidence is conflicting, the Civil Service Commission, acting as a jury, is responsible for determining what the facts in a given case are. Hill v. City of Hattiesburg, 223 Miss. 163, 166, 77 So.2d 827, 828 (1955). However, the facts in this case are not conflicting. Cvitanovich stated that Ladnier was disciplined and that he did not follow police department procedures in implementing the punishment. Cvitanovich admitted to not having documented Ladnier's file to reflect that his transfer to the department of public safety constituted Ladnier's punishment. Then, there is the testimony of Moffett and Mayor Holloway that Ladnier's record did not indicate that he had been punished, therefore, each, apparently, assumed that he had not been sufficiently admonished for his wrongdoing. Thus, the City's administration proceeded to implement a punishment they deemed appropriate for Ladnier's misconduct. Interestingly, none of this testimony is inconsistent or contradictory. Rather, these facts are consistent and logical. Cvitanovich did not document the punishment, so it was not written for the new administration to discover. Perhaps Moffet and Holloway's assumption that Ladnier had not been disciplined was at the very least initially correct as the records failed to reflect as much. However, at some point, if only by virtue of this litigation, the men learned that Ladnier understood his punishment to consist of his transfer, and they refused to accept Ladnier's explanation that he received his discipline through the prior city administration.
¶ 78. The City argues that Ladnier's transfer could not have been discipline because a transfer was not a means of discipline. Rather, the City asserts the only methods of discipline were demotion, suspension or termination. However, pursuant to the City of Biloxi's Civil Service Regulations, and as the majority pointed out, there were other methods of punishing someone for misconduct including verbal and written reprimands.
¶ 79. What makes this case difficult to swallow is the fact that an employee was terminated for his superior's failure to follow police department regulations regarding disciplinary action, that is, Cvitanovich did not appropriately document the disciplinary action against Ladnier. If Cvitanovich had followed departmental rules regarding discipline and appropriately documented Ladnier's personnel file, then the new administration governing the City of Biloxi would have been put on notice that Ladnier had received punishment for his violation of police department regulations and they would have been without authority to invoke additional penalties on Ladnier. Without question Ladnier's actions involving the alteration of the bond amount were wrong and against police department regulations. However, it is excessively harsh to terminate an employee for the improprieties of his superior. Had the Halat administration decided that Ladnier's actions warranted his termination, then it would have been within its discretion to do so.
¶ 80. Because the evidence on this issue is not conflicting, there simply was no credible evidence that Ladnier was not disciplined for his misconduct. That Ladnier's personnel record did not reflect as much is insufficient to support a finding that he was not disciplined. Based upon my understanding of the facts and applicable law in this case, I would rule that the Biloxi Civil Service Commission was not presented with substantial credible evidence on which to find that Ladnier had not been punished by the Halat administration. Accordingly, I would reverse the decision of the circuit court and the Biloxi Civil Service Commission and order Ladnier's reinstatement of his position with Biloxi's Department of Public Safety with full benefits and back pay.
¶ 81. PAYNE, J., JOINS THIS SEPARATE OPINION.
NOTES
[1] Pursuant to sections 99-15-101 through XX-XX-XXX, of the Mississippi Code, as amended, the district attorneys of this state with the consent of a circuit judge, are given the prosecutorial discretion to allow an accused under certain circumstances to enter a "pretrial intervention" program, referred to by the parties in this case as a "diversion program," in lieu of prosecuting the accused on the charges brought against him.
[2] The record does not disclose the policies and procedures governing the City's board of inquiry. However, the board of inquiry in this case apparently consisted of group made up of Ladnier's peers. They were to decide whether the accusations of a wrongdoing violated police policies. The chief of police appointed those to serve on the board but allowed Ladnier to select one member to sit on the board. The board conducted a hearing and listened to the statements of those involved. Apparently, the board was to make a ruling as to guilt, but was not to punish or recommend punishment.
[3] The State ultimately prosecuted Ladnier pursuant to his indictment for alteration of a court document. A trial resulted in Ladnier's acquittal on July 25, 1995.
[4] An examination of the record shows that the Commission never complied with this order. Nevertheless, Ladnier's motion for reconsideration and its attachments is found among the circuit court papers on appeal to this Court.
[5] Sections 21-31-51 through 21-31-75 of the Mississippi Code, as amended, also sets out the statutory scheme for the civil service systems in other Mississippi municipalities. Based on the record before us, we are unable to determine which set of statutes apply to the Biloxi Civil Service Commission. However, the parties have referred to those found in sections 21-31-1 through 21-31-27. Moreover, the statutes in each group which regulate the removal, suspension, and discharge of a civil service employee are identical.
[6] The director of public safety, Windy Sweatman, oversaw the police and fire departments of the City of Biloxi.
[7] The record show that Ladnier entered the pretrial intervention program but is unclear as to why de did not completed it. Nonetheless, after a trial, a jury acquitted Ladnier of the charges against him.
[8] The Biloxi Civil Service Regulations explain that a "transfer" to a lower class is deemed a "demotion," while the regulations define "demotion" as "a reduction to a grade having a lower maximum rate of compensation."
[9] In 1991, Cvitanovich reprimanded Ladnier once for an "verbal confrontation [he had] with the director [of public safety]."
[10] Ladnier sought to introduce evidence regarding the alteration of a police court document regarding the type of charges alleged against "John Doe." While the Commission initially denied Ladnier's requests to admit testimony and evidence concerning the incident, ultimately the Commission allowed several documents relating to the incident into evidence. However, the Commission requested that the name of the individual specifically named in the documents be referred to as "John Doe."
[11] After the Civil Service Commission hearing in a motion for the Commission to reconsider its ruling, Ladnier offered the affidavit of Pete Halat to substantiate his claim that he was erroneously punish twice for the same offense. Because the affidavit was not properly before the Commission when it made its decision, it is likewise inappropriate for us to consider it on appeal.